**This order is SIGNED.**

**Dated: January 28, 2022**



**JOEL T. MARKER**
**U.S. Bankruptcy Judge**



### IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>KEVIN MELILLI,<br><br>     Debtor. | Bankruptcy Case No. 19-20553<br><br>Chapter 7 |
| KENNETH A. RUSHTON, TRUSTEE OF THE BANKRUPTCY ESTATE OF KEVIN MELILLI,<br><br>     Plaintiff,<br><br>v.<br><br>TERRI MELILLI,<br>KEVIN MELILLI,<br>SOUTHERN DIVERSION, LLC,<br>SOUTHERN DIVERSION ONE, LLC,<br>SOUTHERN DIVERSION TWO, LLC,<br>SOUTHERN DIVERSION THREE, LLC,<br>SOUTHERN DIVERSION CHARTERS, LLC,<br><br>     Defendants. | Adversary Proceeding No. 20-2072<br><br>Judge Joel T. Marker |

### MEMORANDUM DECISION ON DEFENDANTS'
### MOTIONS FOR PARTIAL SUMMARY JUDGMENT

More than 26 years ago, in November 1995, First Union National Bank of Florida (First

Union) sued Kevin Melilli and his construction company.  In 1999, First Union obtained a

1

$409,565.70 judgment against the defunct company and a $268,954.09 judgment against Kevin personally.[1]  There's no reason to suspect that the judgment would have been nondischargeable had Kevin filed for bankruptcy all those years ago.  But while the world was concerned with the impending doom of Y2K, Kevin was concerned with how to make himself judgment-proof.  Over the next two decades, with the support of his wife Terri Melilli, Kevin in his telling did not own or earn anything that could be seized for payment of the debt.  Instead, he assisted his wife in her successful mortgage brokering and property rental business ventures.  A self-described "gofer," he performed tasks on her behalf and at her direction, patiently waiting for the 20-year lifespan of the Florida judgment to expire.

First Union assigned the judgment to NC Venture I, L.P. (later known as NC Ventures, Inc.) in June 2001, and NC Ventures, Inc. subsequently assigned the judgment to Premier Capital LLC (Premier) in June 2005.[2]  By all accounts, and the available information on state court dockets, Premier vigorously pursued the judgment.  In the original Florida case, Premier served notices of deposition, submitted discovery requests, and filed motions to compel from 2008 through 2018.[3]  In 2011, Premier domesticated the judgment in Utah and filed no fewer than six applications for writ of garnishment between 2011 and 2014.[4]  But despite the mounting pressure, Kevin persisted.

The finish line was in sight as the judgment was set to lapse in June of 2019.  But then in late 2018, Premier renewed the judgment in Broward County, extending its life for another 20 years.  This time around, Kevin was not willing to wait.  On January 31, 2019, he filed a Chapter 7 bankruptcy petition in the Bankruptcy Court for the District of Utah, and this adversary

---

[1] Docket #66, Defendants' Exhibit 24, Broward County Case. No. CACE95015820.
[2] Proof of Claim #3-1.
[3] *See generally id.*
[4] *See* Third District Court of Utah, Case No. 116500481.

proceeding is at least the beginning of the end of this 26-year saga.  After a separate adversary

proceeding by the U.S. Trustee was dismissed, Kevin received his Chapter 7 discharge, and

substantial discovery was conducted by the Chapter 7 Trustee—essentially on Premier's behalf

and with the dogged assistance of Premier's former counsel—the Defendants (other than Kevin)

moved for summary judgment, and the Court issues this Memorandum Decision to explain why

their motions will be granted.

## I. BACKGROUND[5]

Terri and Kevin Melilli met in 1992.[6]  Before then, Terri had dropped out of college after

finding success as a salesperson and continued in that role until becoming an insurance agent

around 1987.[7]  Terri purchased a condo in Florida around 1988 or 1989 with income she received

from her employment.[8]  Terri earned a substantial income as an insurance agent and founded her

own mortgage brokerage company, First Fidelity Financial Corp. (First Fidelity), in 1997.[9]  All

the loans that were brokered by First Fidelity were brokered under Terri's Correspondent Mortgage

Lender's License,[10] and the company experienced several years of success before finally closing

during the 2008 recession.[11]

---

[5] Record citations in this section are primarily to the Trustee's Memoranda in Opposition to the Motions for Summary Judgment, appearing at docket #s 147 and 148.

[6] Docket #147, ¶ 53.

[7] Id. at ¶ 9.

[8] Id. at ¶ 52.

[9] Id. at ¶¶ 12–14.  Throughout his brief, the Trustee objects to the use of Terri's Declaration (docket #56), arguing that it includes the "inadmissible lay opinion of Mrs. Melilli" and that the declaration contains "conclusions of ultimate fact," citing FED. R. CIV. P. 56(c)(2), FED. R. EVID. 702, and the unpublished *Aludo v. Denver Area Council*, No. 06-cv-02257-LTB-MJW, 2008 WL 2782734, at *1 (D. Colo. July 8, 2008).  Further, he objects to the use of Terri's testimony at her July 8, 2019 Rule 2004 examination conducted by the U.S. Trustee on the basis that his own counsel was not allowed to attend the deposition or cross-examine the witness.  These objections are largely overruled.  First, facts in Terri's Declaration that are based on personal knowledge of life events and accomplishments are clearly admissible and proper for use on summary judgment under FED. R. CIV. P. 56(c)(4).  Second, any statements made by Terri in her declaration or at her July 8, 2019 Rule 2004 examination—which the Trustee himself cites on occasion and submitted as an exhibit (docket #149, Exhibit A)—were subject to questioning by the Trustee's counsel at the Trustee's own depositions of Terri on April 26 and June 11, 2021.

[10] Docket #147, ¶ 19.

[11] Id. at ¶ 119.

Kevin, on the other hand, did not experience as much success in his early business ventures. After dropping out of high school in his sophomore year, Kevin went to work for his father in the construction industry. He eventually began his own construction company, Melilli International, Inc. (MII), presumably sometime in the late 1980s. After MII experienced some initial success, he also started a fast-food franchise with Kenny Rogers Roasters around 1992 or 1993.[12] Both of the companies began to decline in 1995. MII was involved in a dispute regarding a construction contract, and Kevin's relationship with the fast-food franchisor began to deteriorate, with Kenny Rogers Roasters filing for bankruptcy in 1998. MII eventually defaulted on a loan it owed to First Union, and First Union obtained a judgment against MII for $409,565.70, and against Kevin personally for $268,954.09.[13] In addition, Kevin was personally obligated for $497,890.83 in unpaid payroll taxes from his fast-food franchise.[14] Although Terri eventually paid off the payroll taxes and additional amounts that Kevin negotiated with several of his other creditors,[15] First Union's personal judgment against Kevin ballooned into the $791,087.87 claim by Premier that prompted Kevin's bankruptcy.

Terri and Kevin married in 1994.[16] At that time, they were living in a home purchased by Terri's parents on Terri's behalf located in Lighthouse Point, Florida.[17] While Kevin's businesses were in decline, Terri's work as an insurance agent, and later the income generated by First Fidelity, was enough to support them and their twin sons.[18] After refinancing and then selling the Lighthouse Point property, Terri purchased a property in Pompano Beach, Florida in 2002 for

---

[12] *Id.* at ¶¶ 24–26.
[13] *Id.* at ¶¶ 28–34.
[14] *Id.* at ¶ 36.
[15] *Id.* at ¶ 35–39.
[16] *Id.* at ¶ 3.
[17] *Id.* at ¶¶ 56–59.
[18] *Id.* at ¶¶ 21 and 44. The relative involvement of Terri and Kevin in First Fidelity is disputed, but the parties do not dispute that income from the company supported the family.

approximately $1.3m.[19]  A year later, Terri refinanced the Pompano Beach house which allowed

her to profit no less than $605,000 in equity from the property.[20]  In 2003, Terri used the Pompano

Beach equity to purchase property in Islamorada, Florida for approximately $2.2m.[21]

Terri purchased, refinanced, and sold several more properties from 2002 to 2006 (with

Terri as the sole obligor[22]) before eventually purchasing the couples' Park City home in 2006 for

$2.7m.[23]  The Park City home requires the Melillis to be members of the Promontory Club, which

includes a golf course, gym, and other amenities.[24]  The Park City property was purchased using

a $1.755m mortgage, a $250,000 second mortgage, approximately $25,000 in credit card charges,

and personal funds.[25]

In 2008, First Fidelity closed its doors, and Terri began defaulting on various mortgage and

property tax obligations.[26]  Terri started renting out the Islamorada property to help pay for living

expenses, doing business as "Southern Diversion."[27]  Shortly after moving into the Park City

home, Terri befriended Jim Moore, another member of the Promontory Club.  Terri mentioned the

Southern Diversion rental business to Jim, and she eventually presented a property rental business

plan to Jim around February or March of 2013.[28]  Jim discussed the plan with his children, Jeffrey

Moore, Ryan Moore, and Lori Walsh (the Moore Children).  Jim and the Moore Children decided

---

[19] *Id.* at ¶¶ 62–69.

[20] *Id.* at ¶ 73.

[21] *Id.* at ¶¶ 75–76.  The Trustee disputes that Terri purchased the Islamorada Property using funds from the Pompano Beach refinance, but the evidence from the record supports the conclusion that it was indeed purchased using the Pompano Beach equity.  *See* docket #66, Defendants' Exhibit 34 (Uniform Residential Loan Application for Islamorada Property).  This contention will be further addressed in section III.A. below.

[22] Docket #147, ¶ 131.

[23] *Id.* at ¶¶ 78–94.  The Trustee asserts several evidentiary objections to these facts; however, aside from the purchase of the Park City property, these facts are immaterial.

[24] *Id.* at ¶ 102.

[25] *Id.* at ¶¶ 98–99.  The Trustee denies that "Terri purchased" the home but does not deny that only Terri was the named obligor on the first mortgage, second mortgage, and Bank of America credit card.  *See also* docket #66, Defendants' Exhibits 45–47.

[26] Docket #147, ¶ 119.

[27] *Id.* at ¶¶ 120–21.

[28] *Id.* at ¶ 145.  Kevin was also present at the meeting.

to invest in the business plan, which included various partnership and lending arrangements with Terri and Terri's wholly-owned entity, Southern Diversion, LLC (Terri's Entity), as well as four other newly-formed entities: Southern Diversion One, LLC (SD1); Southern Diversion Two, LLC (SD2); Southern Diversion Three, LLC (SD3); and Southern Diversion Charters, LLC (SDC) (together, these subsidiaries are the SD Entities or the Entities). Terri's Entity holds a 50% ownership in each SD Entity, while the Moore Children hold the remaining 50%, in even shares.[29]

Each Entity is subject to its own operating agreement, holds title to real property,[30] and is engaged in short-term property rentals. Pursuant to the SD1 Operating Agreement, Terri deeded the Islamorada property to SD1, and on or about October 31, 2013, the Moore Children paid $2.2m to third-party mortgagors, relieving SD1 of its external debt obligations.[31] On or about May 23, 2013, SD2 purchased property located in Marathon, Florida using a loan from the Moore Children in the amount of approximately $2.76m.[32] On or about August 1, 2014, SD3 purchased property in Key Largo, Florida using a loan from the Karen E. Moore Living Trust U/A/D December 9, 1997 in the amount of $2.1m.[33] And around January 23, 2015, SDC purchased a boat using a $200,000 loan from the Moore Children.[34]

The SD Entities' Operating Agreements designate Terri as the "Operations Manager,"[35] and her listed powers and duties include hiring and firing contractors, subcontractors, and property

[29] Except for SDC, in which Terri's Entity holds a 60% interest, and the Moore Children hold 40%. Additionally, in the Supplement to Defendants' Motions for Summary Judgment (docket #144), the Defendants note that as of August 17, 2021, Terri's Entity had acquired all of the Moore Children's interests in the SD Entities.
[30] Except for SDC, which owns a boat. *See* docket #66, Defendants' Exhibits 1a, 1b, 1c, and 1d. The Trustee objects to the admissibility of the Operating Agreements on the basis that they constitute inadmissible hearsay. That objection is overruled. The Court can properly use the existence of the Operating Agreements, and the contents therein, without considering the truthfulness of the content.
[31] Docket #148, ¶¶ 22–24.
[32] *Id.* at ¶¶ 81–83; docket #66, Defendants' Exhibits 1b and 13.
[33] Docket #148, ¶¶ 85–86.
[34] *Id*. at ¶ 88; docket #66, Defendants' Exhibit 73.
[35] Docket #147, ¶ 154. In turn, Jeffrey Moore is designated as the "Financial Manager" of the SD Entities, with various powers and duties set forth in the Operating Agreements, including oversight of capital structure of the Entities and managing cash investments and excess funds. From the record, however, no evidence has been

6

managers; entering into contracts in connection with the SD Entities' businesses and properties; and being responsible for the rentals and concessions at the SD Entities' properties, among other things.[36]   Each Entity maintains separate books and records through bookkeeper Monica Rodriguez and accountant Carol Sokolow,[37] each Entity files separate tax returns,[38] and each Entity maintains a separate bank account.[39]   Kevin is not a listed member or equity owner in the Entities.[40]   Although he's not a formal owner or employee of the Entities, Kevin regularly performs tasks on his wife's behalf.   He communicates with Joe Oliveira, the property manager for the SD Entities (and Kevin's long-time friend), regarding day-to-day property maintenance; interacts with guests; communicates with certain vendors and third parties, particularly those doing construction or other similar work; and performs miscellaneous other tasks.[41]

Kevin does not receive formal compensation for the work he performs for his wife, and on behalf of the SD Entities, but his personal and living expenses are paid for by the revenues generated by the Entities.[42]   Additionally, Kevin has signed checks and used a debit card drawn

---

introduced to show Jefferey's involvement in the Entities, and it seems that his father, Jim, was primarily in charge of financial oversight. *See*, *e.g.*, docket #66, Defendants' Exhibits 10 and 16.

[36] Docket #148, ¶ 59.

[37] Docket #66, Defendants' Exhibits 1–9 and 14–15.  The Trustee objects to the use of the Defendants' exhibits supporting this fact on the basis that the books and records have not been authenticated as business records and are therefore inadmissible hearsay. *See* docket #148, ¶ 14.  For the reasons stated in FN 30 *supra*, this objection is overruled.

[38] Docket #66, Defendants' Exhibits 2–5.  The Trustee objects to admission of the tax returns on the basis that they have not been cited with particularity in violation of Local Rule 7056-1. *See* docket #148, ¶ 77.  This objection is overruled.  To be sure, the Defendants unhelpfully uploaded their exhibits to the docket in only two very large PDF files (consisting of 2,846 pages and 2,509 pages, respectively), and they take a considerable time to load when opened.  But the Defendants have labeled their exhibits in accord with docket #66-1 and provided separated-out exhibits to the Trustee, albeit only after they read his objections.  As such, the Court finds that the Defendants' exhibits were properly labeled.

[39] Docket #66, Defendants' Exhibits 6–9.

[40] *See id.*, Defendants' Exhibits 1a–1d and 14.  The Trustee denies this statement because, he argues, the Operating Agreements and balance sheets offered in support are inadmissible hearsay.  However, the Trustee also implicitly acknowledges that Kevin is not a formal owner. *See* docket #148, ¶¶ 11 and 76 ("the operating agreements may state that the SD Entities are co-owned by Southern Diversion and the Moore Children," and "the balance sheets may not reflect [Kevin] as a member or equity owner of the SD Entities").

[41] Docket #147, ¶ 311.  The Trustee contends that Kevin's work is not limited to these tasks.

[42] Docket #147, ¶¶ 249, 353–54, and 361–62; docket #159, p. 21.

from Terri's Entity's bank account.[43]  But Kevin has been careful not to own or hold practically anything in his own name out of fear of attachment and execution by Premier.  Indeed, in a 2019 letter to the U.S. Trustee, Kevin's attorney frames his client's situation as such: "From 1999 until December of 2018, [Kevin] lived under the shadow of the Judgment.  He did not work, did not own any property, and did not hold any interest in any business, precisely because he knew anything he had could be taken by his creditor. . . . He has not received any salary, distribution, or equity interest in the business throughout this period."[44]  The letter continues: "[Kevin] very much looked forward to June of 2019 when the 20-year life of the First Union Judgment would expire under Florida law."[45]  In December 2018, however, Kevin received notice of an action pending in a Broward County court seeking to extend the life of the judgment for another 20 years.[46]

Kevin filed for Chapter 7 bankruptcy in this Court on January 31, 2019 to finally resolve the decades-old debt.  Premier is by far the largest creditor of the estate, holding the $791,087.87 judgment that it acquired in 2005.[47]  The deadline to file an objection to discharge or dischargeability under §§ 523 and 727 of the Bankruptcy Code was set for May 6, 2019.  The U.S. Trustee filed a motion to extend his § 727 objection deadline while Premier filed a motion to extend both its § 523 and § 727 objection deadline; the U.S. Trustee's motion was granted, but Premier's motion was denied.[48]

The U.S. Trustee filed adversary proceeding #19-2080 on July 22, 2019 seeking denial of Kevin's discharge under § 727.  The complaint alleged that Kevin misrepresented his asset ownership in his bankruptcy schedules and knowingly and intentionally concealed and/or

---

[43] Docket #159, pp. 22–23.
[44] *Id.* at p. 48; docket #149, Trustee's Exhibit U.
[45] Docket #149, Trustee's Exhibit U.
[46] *Id.*
[47] Only three creditors filed claims in Kevin's bankruptcy case, including Premier.  The other two claims, combined, total $3,550.62.
[48] Bankruptcy Case #19-20553, docket #s 41 and 45.

transferred his interests in the Park City property, the Entities, their respective properties, and the income that they generated. The U.S. Trustee conducted discovery, serving numerous subpoenas and conducting approximately six depositions. Kevin's attorney was the last party to be deposed, and he stated under oath that he advised Kevin to not disclose an interest in the challenged assets. Kevin, in turn, testified at his deposition that he relied on this advice in good faith. The U.S. Trustee determined that the advice of counsel defense would be difficult to overcome at trial given the circumstances of this case and voluntarily moved to dismiss the adversary proceeding, which was granted over the Chapter 7 Trustee's objection on April 21, 2021.[49]

The Chapter 7 Trustee, Kenneth Rushton, employed the law firm that represented Premier in renewing the Florida judgment to represent the bankruptcy estate, undertook substantial investigative efforts in the main bankruptcy case, and ultimately filed the instant adversary proceeding on July 10, 2020 asserting 16 counts against Terri, Kevin, Terri's Entity, and the SD Entities.[50] The Defendants (other than Kevin) filed two separate Motions for Partial Summary Judgment (Motions) on March 1, 2021—one Motion regarding Terri and Terri's Entity,[51] and the other Motion regarding the SD Entities.[52] The Motions were stayed by this Court on March 25 to allow the Trustee to continue discovery,[53] which ultimately included thousands of pages of documents and approximately a dozen depositions. The Defendants then renoticed their Motions

---

[49] Adversary Proceeding #19-2080, docket #s 57 and 66. Of course, an advice of counsel defense requires a debtor's actual and good-faith reliance on his attorney's advice and will fail if the asset patently must be disclosed regardless of what the attorney may advise. *See, e.g., Rupp v. Biorge (In re Biorge)*, 536 B.R. 24 (Bankr. D. Utah 2015); 9 NORTON BANKR. L. & PRAC. 3D § 173:13.3 (Jan. 2022) ("Advice of Counsel Defense in Denial of Discharge Litigation"). In any event, the Chapter 7 Trustee did not appeal or otherwise seek reconsideration of the dismissal of the U.S. Trustee's adversary proceeding, and the Chapter 7 Trustee has no claims for denial of discharge in his own adversary proceeding, so Kevin received his Chapter 7 discharge on May 11, 2021.

[50] First Amended Complaint, docket #143. The Trustee's original Complaint (docket #1) also included the Moore Children as defendants, but the Trustee voluntarily dismissed them on November 3, 2020 (docket #s 25 and 27), and Kevin is only a nominal defendant in this adversary proceeding.

[51] Docket #54.

[52] Docket #53.

[53] Docket #85.

and a supplement for hearing, to which the Trustee filed opposition memoranda on September 10

and the Defendants replied and filed a separate evidentiary brief on October 11.[54]

The Trustee essentially argues that it is Kevin, not Terri, who has been the financial

backbone of First Fidelity, the SD Entities, and the Melilli family.  Therefore, the Trustee believes

that some amount of income generated by the SD Entities in renting out their respective properties

is property of the bankruptcy estate.   Additionally, the Trustee believes that the Islamorada

property and the Park City property are at least partially included in the estate because Kevin was

also the primary manager of First Fidelity, income from which was used to purchase those

properties.  In the Trustee's complaint, he asserts mixed causes of action and remedies regarding

the following: (1) turnover of the Islamorada and Park City properties; (2) avoidance of rental

income transfers (allegedly generated by Kevin and then transferred to Terri, Terri's Entity, and/or

the SD Entities); and (3) unjust enrichment.  In response, the Defendants assert that Terri was the

sole reason for the success of First Fidelity and the SD Entities, and to the extent that Kevin helped

in these ventures, he acted on Terri's behalf and at her direction.  They claim that none of the

properties was purchased with income generated by Kevin and that there is no basis to conclude

that Kevin generated the Entities' rental income, let alone transferred it to Terri, Terri's Entity, or

the SD Entities.

## II. LEGAL STANDARD

"Summary judgment is appropriate only if 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' when viewed in the

light most favorable to the non-moving party, 'show that there is no genuine issue as to any

---

[54] Docket #s 144, 147–48, and 157–59.

material fact and that the moving party is entitled to judgment as a matter of law.'"[55]  "[T]he plain

language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery

and upon motion, against a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof

at trial."[56]  Stated another way, "where the nonmoving party will bear the burden of proof at trial

on a dispositive issue, a summary judgment motion may properly be made in reliance solely on

the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"[57]  Further, "[t]he

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient,"

and "where the [law] mandates a 'clear and convincing' standard, the trial judge in disposing of a

directed verdict motion should consider whether a reasonable factfinder could conclude, for

example, that the plaintiff had shown [an element] with convincing clarity."[58]  In sum, as stated in

the 1963 Advisory Committee Notes to Rule 56, "[t]he very mission of the [salutary device of

summary judgment] is to pierce the pleadings and to assess the proof in order to see whether there

is a genuine need for trial."

### III. DISCUSSION

The First Amended Complaint alleges 16 causes of action, but the Court noted at oral

argument that many of the alleged causes of action were in fact remedies and that the complaint

really only asserted three overarching theories of recovery.  Counsel for the Defendants similarly

framed the complaint in terms of three "baskets" of claims, and counsel for the Trustee did not

---

[55] *Expert S. Tulsa, LLC v. Cornerstone Creek Partners, LLC (In re Expert S. Tulsa, LLC)*, 534 B.R. 400, 408 (10th Cir. BAP 2015) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).
[56] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[57] *Id*. at 324.
[58] *Anderson*, 477 U.S. at 252.

object to either characterization. Those theories, as the Court views them, are claims for resulting

trust, fraudulent transfers, and unjust enrichment.[59]

## A.    Resulting Trust

The Trustee argues that the Islamorada and Park City properties should be turned over to

the estate based on the imposition of a resulting trust.[60]   In support, the Trustee highlights

testimony given by Terri Melilli in her Rule 2004 examination conducted by the U.S. Trustee on

July 8, 2019 that she used income from First Fidelity to make the down payment on both the

Islamorada property and the Park City property.[61]   Additionally, Carol Sokolow (accountant for

First Fidelity, Terri's Entity, the SD Entities, and the Melillis) testified at her deposition in this

action that Kevin was "managing" First Fidelity and that she only saw Kevin, not Terri, when she

visited First Fidelity's office.[62]   Ms. Sokolow also testified that she dealt primarily with Kevin in

connection with services she provided to First Fidelity.[63]   Therefore, the Trustee argues, the

Islamorada and Park City properties were at least partially paid for using funds generated by Kevin

and should be included in the bankruptcy estate.

In response, the Defendants first argue that Kevin never held title to the Islamorada

property, and therefore he never could have transferred it to Terri or SD1. They assert that Terri

purchased the Islamorada Property with funds she earned from refinancing the Pompano Beach

property along with a third-party mortgage (on which she was named the sole obligor).[64]   Terri

then transferred title to the Islamorada Property to SD1 as Terri's Entity's capital contribution,

---

[59] The definitions of "cause of action," "claim for relief," and "remedy"—and the distinctions between them—can be fuzzy both in legal contexts and everyday parlance, *see generally* BLACK'S LAW DICTIONARY (11th ed. 2019), but the basic point is that several of the Trustee's counts involve the form in which or from whom the estate would be compensated and/or depend on other "true" causes of action for their existence.
[60] Counts I–IV.
[61] *See* docket #149, Trustee's Exhibit A, Transcript p. 128.
[62] Docket #149, Trustee's Exhibit D, Transcript p. 25.
[63] *Id.* at pp. 152–53.
[64] Docket #56, Declaration of Terri Melilli in Support of Motions for Summary Judgment, ¶¶ 73–75, 152, and 190.

with the Moore Children matching her contribution by paying off the third-party mortgage.[65]   The

Defendants argue that Kevin was not involved in transferring the Property and that neither Terri,

SD1, nor the Moore Children intended to hold the Islamorada Property in trust for Kevin.

Therefore, they are entitled to summary judgment as to the resulting trust claim regarding the

Islamorada property.

Similarly, the Defendants argue that Kevin never held title to the Park City property and

therefore never transferred it.   The property is titled in Terri's name alone.[66]   They assert that Terri

purchased the Park City Property using a $1.755m third-party mortgage, a $250,000 second

mortgage, $25,000 from a personal credit card, and other personal funds.[67]   Terri further pays for

all associated costs with the Park City Property including HOA fees, utility bills, and property

taxes.[68]   Terri lives in the home and uses it as a personal office, and neither Terri nor the Moore

Children ever intended to hold the property in trust for Kevin.   Accordingly, the essential elements

required to impose a resulting trust are missing.

In Florida, "[a] resulting trust arises when the legal estate in property is disposed of,

conveyed or transferred, but the intent appears or is inferred from the terms of the disposition, or

from accompanying facts and circumstances, that the beneficial interest is not to go to or be

enjoyed with the legal title.   In such a case a trust is implied or results in favor of the person whom

equity deems to be the real owner."[69]   Similarly, Utah law holds that the imposition of a resulting

trust requires a "'manifestation of intent', *i.e.*, intent to retain the beneficial interest in the

---

[65] Docket #66, Defendants' Exhibit 1a.
[66] *Id.*, Defendants' Exhibit 44.
[67] *Id.*, Defendants' Exhibits 45–47.
[68] Docket #147, ¶¶ 105–06.
[69] *Howell v. Fiore*, 210 So.2d 253, 255 (Fla. 2d DCA 1968).

property."[70]   In each state, the evidence required to impose a resulting trust must be clear and convincing.[71]

The Trustee argues that the evidence raises sufficient genuine disputes to warrant a trial. He argues that the evidence indicates an intent for Kevin to retain equitable title to the various properties and business ventures and that Kevin supplied the services and sweat equity to First Fidelity, income from which was then used to purchase the Islamorada and Park City properties. The trustee relies in part on *Key v. Trattmann* for the argument that a resulting trust can be founded on the presumed intention of the parties that the one furnishing money should have a beneficial interest, while the other holds title for convenience or for a collateral purpose.[72]   In *Key v. Trattmann*, Key sued Trattmann for real property that Key claimed he had paid for.  His complaint alleged that he had supplied all funds used to acquire the property and sought specific performance on an alleged oral agreement under which Trattmann, who took title, was obligated to convey the property to Key on demand.[73]  Key was a real estate broker who operated in Florida, and he alleged that, in order to help Trattmann obtain United States citizenship, he negotiated and secured the purchase of the property from a third party, who executed a deed in favor of Trattmann.  The court found that "the record does not disprove that he and Mr. Trattmann agreed and intended that Mr. Trattmann would hold title temporarily for Mr. Key's benefit; that Mr. Key supplied all moneys for the purchase, mortgage loan repayment, and maintenance (including repairs) of the property, and was entitled to and did receive the rental income. . . .  [T]he record [also] does not disprove

---

[70] *Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 598 (Utah 1983) (*quoting* RESTATEMENT (Second) OF TRUSTS § 442).
[71] *Steinhardt v. Steinhardt*, 445 So.2d 352, 357 (Fla. 3d DCA 1984); *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1341 (10th Cir. 1998).
[72] 959 So.2d 339 (Fla 1st DCA 2007).
[73] *Id*. at 341.

that Mr. Trattmann was holding title to the property for the economic benefit of Mr. Key, and that

the only reason the property was put in Mr. Trattmann's name was to help him gain citizenship."[74]

The Trustee also relies on *United States v. Tingey* to support his claim of a resulting trust.[75]

In that case, Douglas Brown and his wife were delinquent on eight years of federal income taxes

spanning from 1993 to 2005, and two years of federal gift taxes, all of which totaled over two

million dollars.  While the couple was delinquent on their taxes, they formed an irrevocable trust

naming Mrs. Brown and their children as the beneficiaries and Tingey (Mrs. Brown's brother-in-

law) as trustee.  In 1993, Mr. Brown purchased a cabin and placed title in the name of the trust.

The district court had determined that "it was plainly apparent" that although the trust was given

legal title, Mr. Brown had paid for the cabin by providing a $5,000 earnest money deposit using

personal funds, he tendered a cashier's check to cover the approximately $72,000 down payment,

and he signed and was personally obligated on the promissory note for the balance of the cabin's

purchase price.[76]  Further, the court found that Mr. Brown "ignored the formalities of the trust in

managing the property, making note payments out of personal funds that were not routed through

the trust, taking care of maintenance, paying insurance premiums (on a policy that was in Brown's

name), and even renting out the cabin without the trustee's knowledge."[77]  In conclusion, the Tenth

Circuit upheld the district court's ruling to impose a resulting trust, allowing the government to

foreclose its lien based on the Browns' delinquent taxes.

Crucially, in the cases cited by the Trustee, courts only imposed a resulting trust when it

was clear that the party seeking to avoid ownership in fact paid for or legally owned the property

---

[74] *Id*. at 343.
[75] 716 F.3d 1295 (10th Cir. 2013).
[76] *Id*. at 1302–03.
[77] *Id*. at 1306.

in question.[78]   Here, that is not the case.   The Trustee's proof on this issue is scant and unpersuasive.   The Trustee almost exclusively relies on two pieces of evidence to support his tenuous resulting trust claims—(1) Terri's prior testimony at her July 8, 2019 Rule 2004 examination (to which he objects to admissibility but also cites and includes as an exhibit), and (2) the deposition testimony of Ms. Sokolow.

To start, Terri's statements at her Rule 2004 examination that she used income from First Fidelity to make the down payments on the Islamorada and Park City properties are unsubstantiated and were later corrected in her Declaration.   The Defendants have submitted the Uniform Residential Loan Application for the Islamorada property,[79] which states that Terri had approximately $613,040 from "proceeds from equity," which aligns with her later testimony that she cashed out the equity of her Pompano Beach home.[80]   Moreover, the Defendants have supplied the $1.755m deed of trust executed in favor of Washington Mutual Bank, the $250,000 "Apache Note," and the $25,000 Bank of America credit card bill, all of which Terri allegedly used to fund the payment for the Park City property.[81]

---

[78] *See, e.g.*, *Maliski v. Maliski*, 664 So.2d 341, 343 (Fla. 5th DCA 1995) (plaintiff sought resulting trust over mobile home that he purchased and placed in ex-wife's name to avoid attachment by claims of current wife); *Medary v. Dalman*, 69 So.2d 888, 889 (Fla. 1954) ("[A]ppellant alleged in detail the circumstances under which the property had been purchased and that the property was purchased solely from the earnings of the [husband], but that title was taken in the name of his wife for convenience only."); *McGavin v. Segal (In re McGavin)*, 220 B.R. 125 (D. Utah 1998), *aff'd*, *In re McGavin*, 189 F.3d 1215 (10th Cir. 1999) (court imposed resulting trust where debtor husband and non-debtor wife purchased property as joint tenants, and husband later quitclaimed interest to wife, with no consideration, while continuing to live in the home, pay the mortgage, and use the home as collateral to take out loans); *Anderson v. Cercone*, 180 P. 586 (Utah 1919) (granting a resulting trust in favor of husband who purchased property in dispute using $1,200 in equity he realized from sale of real property); *see also Frambach v. Dunihue*, 419 So.2d 1115, 1117 (Fla. 5th DCA 1982) ("Neither a constructive trust nor a resulting trust arises in favor of a person who pays no part of the purchase price even though he pays for improvements on the property.") (*citing* 5 Scott, THE LAW OF TRUSTS, §§ 455.7, 472 (3d ed. 1967)).
[79] Docket #66, Defendants' Exhibit 34.
[80] Docket #56, ¶ 75.
[81] *See* docket #66, Defendants' Exhibits 45–47.   The "Apache Note" is a debt obligation in favor of the former property owner's business.

The Defendants further state that Terri's testimony at the Rule 2004 examination was "made without the benefit of documentary evidence to refresh her recollection of events that occurred more than ten years ago."[82]   Given Terri's corrected testimony and the ample documentary evidence in support thereof, the Trustee's reliance on a single statement from an early Rule 2004 examination is not even a scintilla of evidence and cannot give rise to a reasonable inference in his favor that would defeat summary judgment.  The only reasonable inference on this record is that Terri did not use income from First Fidelity to purchase the Islamorada or Park City properties, and the Trustee has provided no evidence to the contrary, let alone clear and convincing evidence.

Furthermore, even if Terri did use income from First Fidelity to make the down payments, the testimony of Ms. Sokolow is similarly insufficient to defeat summary judgment.  While the Trustee highlights Ms. Sokolow's testimony that Kevin was "managing"[83] First Fidelity, she also testified that "Terri was the owner."[84]   And although the Trustee points out that Ms. Sokolow assumed that Kevin was management because "that's who [she] saw when [she] visited First Fidelity, who [she] spoke to,"[85] the Trustee omits the fact that Ms. Sokolow only physically went to the First Fidelity office "[m]aybe five times"[86] over the course of eight years.  One final point— the Defendants correctly argue that Ms. Sokolow, in her limited capacity as an outside accountant, does not have personal knowledge of who managed and operated First Fidelity or who was primarily responsible for its success.

---

[82] Docket #158, p. 6, n.14.
[83] Docket #149, Trustee's Exhibit D, Transcript p. 25.
[84] *Id.*, Trustee's Exhibit H, Transcript p. 233.
[85] *Id.* at p. 235; Docket #147, ¶ 228.
[86] Docket #149, Trustee's Exhibit H, Transcript p. 233.

Moreover, even assuming that Kevin did perform substantial work on behalf of First Fidelity and that First Fidelity income was in fact used to purchase the Islamorada and Park City properties, it remains unclear exactly what the Trustee would be entitled to. Indeed, at oral argument the Court repeatedly asked the Trustee's counsel to clarify exactly what the Trustee believes to be property of the estate, and his answers ranged from the tautological ("the estate's interest") to the merely unhelpful ("some or all," "one-half to all").[87] The Trustee provided no evidence for these assertions and has made no attempt at any point in this adversary proceeding either to quantify the estate's interest or to propose a methodology for such quantification. The Trustee does not dispute that Terri performed at least some significant work for First Fidelity, even admitting that all the loans provided by the company were brokered under her mortgage license.[88] So what amount is she entitled to? The Trustee leaves it up to the Court to decide, with nothing more than the contradicted Rule 2004 examination transcript and a couple lines of testimony from an outside, remote-working accountant as support to justify a trial. The Trustee has had a year and a half to collect evidence to support his position. After conducting roughly a dozen depositions and obtaining thousands of pages of documents in discovery, he has failed to do so.

## B.    Fraudulent Transfers

At this point, some clarification is necessary. To reiterate, the Trustee's complaint alleges 16 causes of action, five of which concern fraudulent transfers under §§ 544 and 548 of the Bankruptcy Code.[89] These counts include claims of both actual and constructive fraud under federal and state law. To show actual fraud, the Trustee must prove:

> (a) a transfer of an interest of the debtor in property or the incurrence of an obligation by the debtor;
> (b) made within two years before the debtor filed for bankruptcy; and

---

[87] November 16 Hearing Recording at 2:57:54-3:01:55 PM.
[88] *See* docket #147, ¶ 19.
[89] Counts VII–XI.

(c) done with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.[90]

Constructive fraud requires showing:

(a) a transfer of an interest of the debtor in property or the incurrence of an obligation by the debtor;
(b) made within two years before the debtor filed for bankruptcy;
(c) for which the debtor received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(d)(i) the debtor was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation,
(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital,
(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured, or
(iv) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.[91]

Obviously, these claims require specific elements and are governed by various sources of law, including the Bankruptcy Code, Utah statutes, and Florida statutes. This is to say that there is not a perfect overlap between the claims asserted under these counts and the Trustee's "nominee liability," "alter ego," and other equitable arguments. Nonetheless, the Trustee sporadically changes lanes without signaling—he conflates vague and nebulous language under varying theories of recovery without identifying exactly which counts his arguments are intended to support, leaving his avoidance claims high and dry.[92]

The Trustee's argument sections in both of his briefs fail to even mention § 548, and they only mention § 544 in passing when discussing the Defendants' statutes of limitations and laches

---

[90] 11 U.S.C. § 548(a)(1)(A); Fla. Stat. § 726.101 *et seq.*; Utah Code § 25-6-101 *et seq.* The Florida and Utah statutes are almost identical except that they include a four-year lookback period instead of two.
[91] 11 U.S.C. § 548(a)(1)(B).
[92] For example, in docket #147, Argument § II.A. and B., he states that he has established nominee liability of Terri under Florida and Utah law (which was not originally pleaded); Argument § IV.A. assumes the conclusion that "Material Issues of Fact Exists [sic] Regarding the Extent to Which the Debtor has Diverted the Fruits of his Labor to his Insiders"; and no subpart of the brief specifically concerns avoidance actions under §§ 544 or 548.

defenses, which the Court stated at oral argument were not particularly persuasive. The Trustee fails to provide any argument directly on point regarding his avoidance claims, instead arguing that Kevin diverted the fruits of his labor and citing inapposite authority regarding denial-of-discharge actions under § 727 as support. Tellingly, *none* of the cases that the Trustee cites involve claims under §§ 544 or 548.

The Trustee relies on case law from Florida and Utah that purportedly resembles the facts at hand and justifies his avoidance claims. One case, *In re Bellassai*, is supposedly "glaringly similar" to the facts at hand, because the debtor contributed labor and experience to his girlfriend's towing business and "retained continued enjoyment of the material comforts purchased with the fruits of his labor."[93] The Trustee omits that *Bellassai* was decided in the context of a denial-of-discharge action under § 727. Also, there are clear facts that distinguish *Bellassai* from the Melillis. The debtor in *Bellassai* owned a towing business for many years, which, just before filing for bankruptcy, he sold to his girlfriend. The girlfriend did not perform any due diligence before purchasing the business and had little prior experience in the car care and towing industry. The girlfriend testified that she does not review profit and loss statements, does not know what happens to invoices, does not review the business's receipts as a usual practice, and does not review the business's bank statements. Ultimately, the court found that it was clear "that [the girlfriend] was not experienced in the field and remained completely uninformed about basic aspects of the business for fifteen years. The story put forward by the Debtor . . . is not credible."[94]

In contrast, Terri has a business background and has exhibited an in-depth knowledge of nearly every aspect of the SD Entities. In her multiple depositions, Terri has detailed the operating costs of the Entities, the per-night rental and security deposit amounts, the Entity distributions,

---

[93] *Gary J. Rotella & Assocs., P.A. v. Bellassai (In re Bellassai)*, 451 B.R. 594, 602 (Bankr. S.D. Fla. 2011).
[94] *Id*. at 598.

individual payments into and out of Terri's Entity's corporate account, maintenance and repair costs after hurricane Irma, loan specifics with the Moore Children, and much more.[95]

Further, the Trustee's reliance on *In re Coady* is misplaced.[96]  In *Coady*, the Eleventh Circuit confirmed that the debtor had concealed assets and denied his discharge, again in a § 727 action.  The court concluded that the debtor "was the sole person actually and actively involved in the [businesses,] and [their] success depended solely on his continued efforts."[97]  Finally, the court emphasized that its decision hinged on the debtor's alleged concealment of his assets, which is both broader and categorically different than a fraudulent transfer claim.[98]

This case is also not similar to *In re Ogalin*, in which the debtor was again denied a discharge under § 727 for concealment of assets.[99]  There, the court found that the debtor acquiesced to a scheme by his wife to divert assets acquired by their labor in a family-owned business away from claims of their creditors.  The couple did so by placing assets, including the home in which the family lived, in the name of their 20-year-old daughter.  The Trustee highlights a section of the opinion where the court mentions that

> [a] recurring theme in their testimony was a general minimization of the role of [the debtor] in the success of the enterprise.  He was characterized as a depressed, part-time estimator whose poor management skills were a liability to the Corporation.  By contrast, [the debtor's daughter and wife] were portrayed as energetic, competent, and hard-working employees executing the vast majority of the Corporation's business functions, and therefore largely responsible for its success.[100]

---

[95] *See generally* Terri's July 8, 2019 Rule 2004 Examination, docket #66, Defendants' Exhibit 23.
[96] *Coady v. D.A.N. Joint Venture III, L.P. (In re Coady)*, 588 F.3d 1312 (11th Cir. 2009).
[97] *Id*. at 1315.
[98] *Id*. at 1316 ("Significantly, § 727(a)(2) does not require a transfer at all; on the contrary, it refers to the transfer *or* concealment of assets, and 'the atypical structure of the concealment alleged here is not reason alone to absolve the Debtor of concealment in the one-year pre-petition period.'") (*citing The Cadle Co. v. Ogalin (In re Ogalin)*, 303 B.R. 552, 558 (Bankr. D. Conn. 2004)).
[99] *The Cadle Co. v. Ogalin (In re Ogalin)*, 303 B.R. 552 (Bankr. D. Conn. 2004).  In addition, this Court has some disagreements with the *Ogalin* decision even in its own § 727 context.
[100] *Id*. at 559.

But Kevin has never been described as a "liability" to the businesses, and on that particular record, the court found the testimony "not credible as to the degree of [the debtor's] contribution to the business enterprise of the Corporation."[101]  Along the same lines, this case does not resemble *In re Gasson*, in which the district court affirmed denial of the debtor's discharge under § 727 for concealment of assets where the debtor "did the vast majority, if not the entirety, of work operating and generating revenue for" the company owned by his wife[102]; or *In re Gordon*, in which the court denied the debtor's discharge under § 727 for concealment and false oath based on findings that the debtor's wife was merely a nominee of the debtor, where funds used to purchase a house originated from joint capital gains and the debtor retained and selectively utilized all the benefits of ownership.[103]

The Trustee has not provided sufficient evidence to warrant a reasonable inference in his favor that Kevin was solely or vastly responsible for the success of the Entities, as was shown in each of the Trustee's cited cases.  Beyond the testimony of Ms. Sokolow, the Trustee has cobbled together assorted incidents of Kevin acting on behalf of the Entities such as communicating with a Florida wedding planner,[104] attempting to solicit funds from third-party investor Peggy Bergmann (which apparently failed),[105] and using the first-person "we" in an email from September 2015 and "I" in an email from January 2018 when discussing the Entities,[106] among others.  But in the context of this record, this amalgamation amounts to no more than a scintilla of evidence in the Trustee's favor.  While Kevin certainly did some work—indeed, more work than

---

[101] *Id.*

[102] *Gasson v. Premier Capital, LLC (In re Gasson)*, 629 B.R. 539, 543 (S.D.N.Y. 2021).

[103] *Wieland v. Gordon (In re Gordon)*, 509 B.R. 359, 369 (Bankr. N.D. Okla. 2014), *aff'd*, 526 B.R. 376 (10th Cir. BAP 2015).

[104] Docket #149, Trustee's Exhibit S, Transcript pp. 101–03.

[105] *Id.*, Trustee's Exhibit N; docket #66, Defendants' Exhibits 2–9 (Entities' tax returns and bank statements indicating no funds received from Ms. Bergmann).

[106] Docket #149, Trustee's Exhibit L; and Exhibit H, p. 715 of 740.

the narrow word "gofer" may suggest—the record shows that Terri was heavily involved, if not solely responsible, for the success of First Fidelity and the SD Entities.  For example, Terri solicited investments from Jim Moore and the Moore Children;[107] Terri handled the sale of SD3's Key Largo property;[108] Ms. Sokolow testified that she spoke with Terri about various aspects of both the First Fidelity and SD Entities' businesses;[109] Christian Cruz, a real estate attorney involved with the Entities, regularly interacted with Terri;[110] and Joe Oliveira, the property manager of the Entities, testified that Terri manages expenses, approves and wires him reimbursements, and that he generally communicates with Terri regarding rental calendars, guests' experiences, improvements, and "day-to-day stuff."[111]

And finally, as with his resulting trust claims, the Trustee neither quantifies the estate's interest nor suggests a methodology for such quantification.  At oral argument the Trustee's counsel offered to provide summaries of the SD Entities' voluminous cash flow records, but the Trustee has no expert witness to decipher them and offers no theory for how the Court could possibly dissect the income stream of each Entity to determine what amount, if any, is attributable to Kevin, as opposed to Terri, Joe Oliveira, or others.[112]  The Trustee also does not dispute that

---

[107] *Id.*, Trustee's Exhibit E., Transcript pp. 30–35.  Jim Moore testified that he was in business with Terri, that Kevin "wasn't [his] partner," and that Terri "had a track record" in renting out the Islamorada property.

[108] *Id.*, Trustee's Exhibit G., Transcript p. 173.

[109] *See id.*, Trustee's Exhibit H, Transcript pp. 232–41.  Ms. Sokolow testified that "Terri was the owner" of First Fidelity; regarding the Entities, she had conversations with Terri about "[d]eposits, banking, rental deposits, [and] replacements of things in the unit"; she testified that Terri ultimately approved the Entities' tax filings; she received tax information from Terri, including "[s]ecurity deposits from future renters, whether purchases were for replacements, what sales tax is owing, *et cetera*"; and she spoke with Terri concerning tax issues, including tax liabilities related to the sale of real property.

[110] *Id.*, Trustee's Exhibit R, Transcript p. 34 ("[Kevin] was my contact person, I usually spoke with him.  I also spoke with Terri.  I don't think that's, you know, a revelation.")

[111] *Id.*, Trustee's Exhibit T, Transcript pp. 176, 209–10, 215–18.

[112] And even if the Court could somehow answer the abstruse questions of who generated exactly how much income for the SD Entities, the Trustee offers no basis for translating that figure into a recovery for the estate—*e.g.*, if Kevin is found to have done work that generated 36% of the SD Entities' income, does that entitle the estate to 36% of that income?  At times, the Trustee's position even borders on suggesting that a company's employees either own or are entitled to income in direct relation to the amount of corporate revenue that their labor generates.

approximately 90% of the rental income is generated from third-party vendors such as Vrbo and HomeAway.[113]  In sum, the Trustee has failed to raise genuine issues of material fact that would defeat summary judgment and warrant a trial on his fraudulent transfer claims.

## C.    Unjust Enrichment

The Trustee's final substantive claims are for unjust enrichment.[114]  The Trustee also asserts a claim for imposition of a constructive trust, which requires clear and convincing evidence, but unjust enrichment is a prerequisite to that claim.[115]  In Utah, "[t]o recover on a claim for unjust enrichment, [a plaintiff] must establish three elements: (1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."[116]  In Florida, "[a] claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof."[117]

The Defendants point out that Utah law provides that "[s]ervices officiously or gratuitously furnished are not recoverable.  Nor are services performed by the plaintiff for his own advantage, and from which the defendant benefits incidentally, recoverable."[118]  Similarly, in Florida, services

---

[113] Docket #147, ¶¶ 301–02.

[114] Counts XII–XIII.

[115] *Bird v. McCauley (In re McCauley)*, 549 B.R. 400, 415 (Bankr. D. Utah 2016) ("Under Utah law, '[c]ourts recognize a constructive trust as a matter of equity where there has been (1) a wrongful act, (2) unjust enrichment, and (3) specific property that can be traced to the wrongful behavior.'") (*citing Wilcox v. Anchor Wate Co.*, 164 P.3d 353, 362 (Utah 2007); *Castetter v. Henderson*, 113 So.3d 153, 155 (Fla. 5th DCA 2013) ("The four elements that must be established for a court to impose a constructive trust include: (1) a promise, express or implied; (2) a transfer of property and reliance thereon; (3) a confidential relationship; and (4) unjust enrichment.").

[116] *Richards v. Brown*, 222 P.3d 69, 78–79 (Utah App. 2009) (*quoting Jeffs v. Stubbs*, 970 P.2d 1234, 1248 (Utah 1998)), *aff'd on other grounds*, 274 P.3d 911 (Utah 2012).

[117] *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (*citing Fla. Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1241 n.4 (Fla. 2004)).

[118] *Jeffs v. Stubbs*, 970 P.2d 1234, 1248 (Utah 1998).

may also constitute a benefit; "[h]owever, this general rule is not applicable if the services are rendered by and for members of the same family or relatives who live together."[119]  Under this reasoning, the Defendants argue, nothing that Kevin does for Terri, or vice versa, could be recoverable under a theory of unjust enrichment.  Plus, to the extent that Kevin has unjustly enriched Terri and the Entities, he has already received consideration in the form of living expenses.

The Trustee distinguishes *McLane*, saying that the plaintiff there made payments on his partner's behalf without the expectation of repayment, while here, Kevin expected to have his personal and living expenses paid for by Terri, Terri's Entity, and/or the SD Entities.  The Trustee also asserts that Kevin admitted that, since the judgment was entered against him, he has structured his affairs in such a way so that he does not hold any assets in his name.[120]  Finally, the Trustee contends that unjust enrichment is a fact-intensive question that cannot be dealt with at the summary judgment stage.[121]

There are several problems with the Trustee's arguments.  First, "[r]ecovery under [unjust enrichment] presupposes that no enforceable written or oral contract exists."[122]  The Trustee is implying that Kevin and Terri had an agreement, explicitly acknowledged or not, that Kevin would perform work for Terri and the SD Entities in exchange for his personal and living expenses to be paid for.  This type of speculative contract formation is exactly what the Utah Supreme Court has

---

[119] *McLane v. Musick*, 792 So.2d 702, 705 (Fla. 5th DCA 2001).
[120] Docket #147, p. 111.
[121] *Rawlings v. Rawlings*, 240 P.3d 754, 766 (Utah 2010) ("[D]etermining whether the circumstances surrounding the parties' interactions were inequitable is a fact-intensive process for which trial courts are uniquely suited.  The nature of this equitable determination requires balancing the ramifications of an entire course of conduct.  The trial court, having heard all of the evidence in context, is in the best position to undertake this balancing.  Second, cases of unjust enrichment require the trial judge to observe facts, such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts.") (internal quotations omitted).
[122] *Ashby v. Ashby*, 227 P.3d 246, 251 (Utah 2010) (internal quotations omitted).

stricken down in the past. Specifically, the court has "declin[ed] to recognize the remedy of [unjust enrichment between spouses] because (1) it treated marriage as a 'venture akin to a commercial partnership,' [and] (2) recovery under the remedy would be 'extraordinarily speculative.'"[123]

Additionally, the Trustee's reliance on *Rawlings* for his argument that unjust enrichment cannot be decided on summary judgment is simply mistaken. *Rawlings* does not stand for the proposition that any party that pleads unjust enrichment is entitled to have a trial on the matter. The quoted passage in the Trustee's brief from the *Rawlings* opinion was merely clarifying that the court of appeals erred in overturning a finding of fact by the trial court relating to the plaintiff's unjust enrichment claim, because the court of appeals "[did] not appropriately defer to the trial court's judgment with regard to the claim for unjust enrichment."[124]

Next, regarding the third element of unjust enrichment (that it would be inequitable for the defendant to retain services without paying the value thereof), the evidence stands in direct opposition. To the extent that Kevin conferred any benefit on Terri or the Entities, he has been significantly reimbursed. As mentioned, Terri paid off Kevin's payroll tax obligations that he incurred from the Kenny Rogers Roasters franchise (approximately $497,890.83) as well as negotiated amounts with other creditors, and Terri pays for all of Kevin's housing, food, and other living expenses.[125]

Lastly, in the same vein as his other causes of action, the Trustee faces a problem in quantifying the estate's interest—the Trustee offers no way to pin a dollar amount to the value of the work that Kevin performed on Terri and the Entities' behalf. "Damages in an action for unjust

---

[123] *Id.* at 250 (*quoting Martinez v. Martinez*, 818 P.2d 538, 540–41 (Utah 1991)).
[124] *Rawlings*, 240 P.3d at 767.
[125] *See* docket #147, ¶¶ 35–39 and 50; *see also Weinman v. Crowley (In re Blair)*, 594 B.R. 712, 768 (Bankr. D. Colo. 2018) (court determined that wife was not unjustly enriched from husband's monetary gifts, reasoning that husband then lived at the property rent-free and benefited from the use of the property).

enrichment may be valued based on either (1) the market value of the services; or (2) the value of the services to the party unjustly enriched,"[126] but neither valuation method is applicable here.  It is also worth noting again that the Trustee admits that approximately 90% of the rental income is generated from third-party vendors such as Vrbo and HomeAway.[127]  It is impossible to determine what amount of the remaining 10% of the rental income is attributable to Kevin's efforts, and further, what amount the estate would be entitled to.  For all of these reasons, the Trustee has not demonstrated genuine issues of material fact for trial that would defeat summary judgment on his unjust enrichment claims.

**D.    Remaining Claims and Considerations**

Beyond the claims discussed so far, the Trustee also seeks reverse veil-piercing of Terri's Entity and the SD Entities; turnover of "certain or all of the assets of" those entities if the estate is deemed to own them; and declaratory judgments that would entitle the estate to some or all of the Islamorada property, the Park City property, and the membership interests in Terri's Entity and the SD Entities.[128]  The declaratory judgments can be quickly disposed of given the failure of the Trustee's underlying substantive causes of action.[129]  And while the reverse veil-piercing claim may potentially be permitted even though Kevin is not a shareholder of the Entities, it is an extremely tenuous claim at best.  To prevail, the Trustee must show that "(1) the *shareholder* dominated and controlled the corporation to such an extent that the corporation's independent existence[] was in fact non-existent and the *shareholders* were in fact alter egos of the corporation;

---

[126] *F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So.3d 39, 50 (Fla. 4th DCA 2021) (internal quotations omitted).
[127] Docket #147, ¶¶ 301–02.
[128] Counts V, VI, and XIV–XVI.
[129] *See Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008) ("[A] declaratory judgment plaintiff must present the court with a suit based on an 'actual controversy,' a requirement the Supreme Court has repeatedly equated to the Constitution's case-or-controversy requirement.").

(2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant."[130]

The Trustee's claim on this issue is so tenuous because, as the Court has previously discussed, the Trustee has not provided sufficient evidence to raise a reasonable inference in his favor that Terri was not heavily involved in nearly every aspect of the entities' business affairs.[131] He also has not raised genuine issues that Terri's Entity or the SD Entities were used fraudulently or for an improper purpose. While Terri's Entity is a single-member LLC that Terri established on the advice of Ms. Sokolow, SD1, SD2, SD3, and SDC were multi-member LLCs formed as a result of arms-length transactions between Terri and the Moores,[132] and all of these entities have complied with corporate formalities—filing yearly tax returns, maintaining separate books and records, using corporate bank accounts, and the like. And with the reverse veil-piercing claim gone, the related claim for turnover of "certain or all" of the entities' assets necessarily fails.

Finally, as a practical consideration, the Court asked the Trustee's counsel at oral argument to describe what an in-person bench trial of this adversary proceeding would look like.[133] All of the major third-party players live in Florida or Georgia—Carol Sokolow, Monica Rodriguez, Joe Oliveira, Christian Cruz, and Jeff Hocker—so they cannot be compelled to testify at trial, and the parties' counsel would only be reading their same favorite deposition transcript excerpts that have already been presented to the Court in connection with the instant Motions. And even if the Court

---

[130] *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011); *see also Gasparini v. Pordomingo*, 972 So.2d 1053, 1055 (Fla. 3d DCA 2008). In *Molinos*, 633 F.3d at 1350, the Eleventh Circuit also suggested that the Florida Supreme Court would likely recognize a unity of interest in a corporation between a husband and wife, even though only one spouse may be a formal shareholder.

[131] *See* FNs 95 and 107–111 *supra*.

[132] Docket #147, ¶ 145; docket #149, Trustee's Exhibit E., Transcript pp. 30–35.

[133] The Court is aware of developing case law regarding remote trial testimony and the interplay of Federal Rules of Civil Procedure 43 and 45, but to date, nobody has mentioned anything other than a full in-person trial of this adversary proceeding. *See, e.g.*, *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, Case No. 17-md-2785-DDC-TJJ, 2021 WL 2822535 (D. Kan. July 7, 2021).

were to question the credibility of Terri, Kevin, or Jim Moore on the stand, that would be stacked

against not only their prior testimonies but the voluminous documents supporting the Defendants'

position.  As such, it is difficult to see what purpose further proceedings would serve in resolving

this matter.

## IV. CONCLUSION

After Kevin's construction business failed, Kevin was able to negotiate and pay off many

of his debts with Terri's financial assistance, but not the personal judgment in favor of First

Union.[134]  And even though the judgment was by all accounts dischargeable, he did not file for

bankruptcy to take care of the debt at the time.  Instead, he began a quixotic 20-year quest to avoid

paying First Union and later Premier by declining to own any assets or earn any income that they

could seize.  Fortunately for him, Terri experienced a great deal of business success during this

time, so his material standard of living did not suffer even if his personal options and sense of self

were voluntarily limited.  His actions have also resulted in the inordinate expenditure of time and

resources for everyone involved.

But there is no requirement that a judgment debtor in Kevin's situation must own or earn

anything to pay his debt, and this specific adversary proceeding is about the Chapter 7 Trustee's

attempt to obtain assets for the estate in order to pay Premier since Kevin did not.  Premier

conducted years of supplemental proceedings before the bankruptcy case was filed, and this Court

gave the Trustee a very wide berth to conduct further discovery on behalf of his *de facto* client.

But as discussed above, when presented with the instant Motions, the Trustee failed to adequately

present legal theories and to marshal sufficient evidence to raise genuine factual issues that would

warrant a largely paper trial, so this long and winding road finally ends (or at least begins to end)

---

[134] Docket #147, ¶¶ 35–39.

here.  The Motions are GRANTED, and the Court will issue a separate Order and Judgment in accordance with this Memorandum Decision.[135]

--------------------------------------------END OF DOCUMENT--------------------------------------------

---

[135] As discussed at oral argument and in FN 50 *supra*, Kevin is only a nominal defendant in this adversary proceeding, so the action will be dismissed as to all defendants even though Kevin did not participate in the Motions.

**_____ooo0ooo_____**
**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION ON DEFENDANTS'
MOTIONS FOR PARTIAL SUMMARY JUDGMENT** will be effected through the
Bankruptcy Noticing Center to each party listed below.

Kenneth Rushton
P.O. Box 212
Lehi, UT 84043
801-768-8416
*Trustee of Kevin Melilli's
Bankruptcy Estate*

Thomas H. Curran
Peter Antonelli
Curran Antonelli, LLP
10 Post Office Square
Suite 800 South
Boston, MA 02109
*Counsel for Trustee Rushton*

Terri Melilli
7751 West Hills Trail
Park City, UT 84098
*Defendant*

George B. Hofmann
Jeffrey L. Trousdale
Cohne Kinghorn PC
111 E. Broadway, 11th Floor
Salt Lake City, UT 84111
*Counsel for Terri Melilli, Terri's
Entity, and the SD Entities*

Kevin Melilli
7751 West Hills Trail
Park City, UT 84098
*Debtor/Defendant*

Reid W. Lambert
Strong and Hanni P.C.
102 South 200 East
Suite 800
Salt Lake City, UT 84111
*Counsel for Kevin Melilli*